UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SIERRA GOLIA-HUFFMAN,

    Plaintiff

v.

SMITH'S FOOD & DRUG CENTERS, INC.,

    Defendant

Case No.: 2:21-cv-01260-APG-EJY

**Findings of Fact and Conclusions of Law**

I conducted a bench trial on November 4, 2024 and April 24-25, 2025. Below are my findings and conclusions, as required under Federal Rule of Civil Procedure 52(a).

I.     **FINDINGS OF FACT**

    1.     On May 10, 2020, Sierra Golia-Huffman went to the Smith's grocery store located at 7130 North Durango Drive, Las Vegas, Nevada to buy flowers for her mother. She slipped and fell in the store.

    2.     Golia-Huffman was in the store for approximately six minutes. On her way to the floral case, Golia-Huffman walked over the area where she later fell, without incident. After selecting a bouquet of flowers, she turned and walked away from the floral case and fell approximately three to four feet from the case. She landed on her knees, immediately stood up unassisted, and walked to the self-checkout area to buy the flowers.

    3.     It was Mother's Day, which is a busy day for flower sales. To guard against spills in the floral department, Smith's placed floor mats in front of the two flower cases. The store also placed two caution cones in the area, one at each end of the

department, and assigned an extra clerk to the floral department that day.

4. In addition to the floor mats in front of the floral cases, Smith's provided plastic sleeves for customers to place bouquets of flowers in. Golia-Huffman did not use a plastic sleeve.

5. There are two angles of video from surveillance cameras closest to where Golia-Huffman fell, but neither shows the condition of the floor before or during her fall.

6. Smith's representative Nathan Prell testified that all employees are required to immediately clean water on the floor if they see it. As he described it, "if you see it, you own it." This is mirrored by Smith's Safety Requirements for the Floral Department, which state: "any spills [are to be] cleaned up as soon as they are found" and "[s]ales floors are to be neat and clean at all times." Exh. 73 at 3-4. Smith's policy also required inspections of the entire store every half-hour.

7. Smith's employee Jeremy Greaney allegedly inspected the store between approximately 9:45 and 10:01 a.m. Exhs. 67, 68. He wrote in the Sweep/Floor Inspection Statement that he saw "lose pedals (sic) and drops of water" in the area where Golia-Huffman fell. Exh. 67. Golia-Huffman fell at 10:23 a.m.

8. Prell testified that no employee cleaned the floor between the time Greaney identified the water and petals in the area and Golia-Huffman fell. The surveillance video confirms that. Prell testified that Smith's anticipated an increased risk of slips in the floral area that day because it was Mother's Day when flower purchases are very heavy. Yet there was no evidence of any Smith's employee sweeping, mopping, or cleaning the area of the fall in the hour before the fall.

/ / / /

9. One of Golia-Huffman's experts, Frank Perez, testified that the industry standard for slip resistance value for the floor in the location of the fall is 0.50. ECF No. 133 at 162. Smith's offered no competing evidence. When Perez visited the store, he tested and recorded the slipperiness of the wet floor to be 0.07. That means the wet floor was below the industry standard, very slippery, and "really dangerous." *Id.* at 162-163. Smith's offered no expert testimony to rebut that opinion.

10. All medical professionals agreed that Golia-Huffman's knees were injured in the fall and that she required surgery to her right knee. There was no dispute that all her knee treatments were appropriate, medically necessary, and directly related to the fall injury. There was no dispute as to the costs of her knee treatments.

11. All medical professionals agreed that Golia-Huffman's lower back was injured in the fall. The injuries included lumbar strain, new or aggravation of L4-5 herniation, and aggravation of preexisting lumbar spondylosis at L3-4 and L4-5. Golia-Huffman initially underwent non-surgical treatments including physical therapy, an epidural steroid injection, and two sets of bilateral medial branch blocks. She also tried bilateral L3 and L4 radiofrequency ablations.

12. These treatments did not alleviate her pain, so her first doctor, Dr. Jason Garber, recommended she undergo an L4-5 disk replacement surgery. Golia-Huffman sought a second opinion from Dr. George Elkanich, who eventually recommended an L4-5 fusion surgery. Golia-Huffman chose to undergo the fusion, which took place in December 2021.

13. Smith's contends that Golia-Huffman chose surgery too soon and that she should have undergone additional epidural injections. Even if surgery was needed,

3

Smith's contends, a disc decompression would have been the medically reasonable surgery to perform. Smith's medical expert, Dr. Vladimir Sinkov, opined that decompression surgery would be a more conservative treatment than fusion because if it did not work, a fusion could be performed later, while a fusion is almost always irreversible.

14. The testifying physicians (Drs. Elkanich, Muir, and Sinkov) do not contend that the others' recommended spinal procedure would constitute malpractice or fall below the standard of care. Rather, each testified that their own recommendations were more appropriate for Golia-Huffman's injuries and pain.

15. Given Golia-Huffman's age and activity level, it is highly likely she will need another spine surgery in the future to address adjacent level breakdown. The alternatives include implantation of a spinal stimulator or a fusion of the adjacent level.[1] The cost of those procedures is estimated between $400,000 and $600,000 depending on the type of procedure. Golia-Huffman's expert, Dr. Muir, testified that the spinal stimulator would give Golia-Huffman nearly identical relief as the fusion (because she would not feel the pain), is less invasive and risky than fusion, and would cost less (approximately $400,000 over the course of her life).

16. Golia-Huffman, her sister, and her former life partner all testified as to the pain and suffering the fall caused her. Golia-Huffman's sister and former boyfriend testified that it took approximately two years for Golia-Huffman to return to her pre-fall

---

[1] Dr. Elkanich testified that a revision to the current fusion (to remove or adjust the screws) might be justified to address Golia-Huffman's pain at the time he last saw her in December 2022. ECF No. 133 at 229-31. But that would not address later adjacent level breakdown. *See id.* at 237-38.

self. Among other impacts, Golia-Huffman could not play with her young son as much as usual, play softball (she previously played several times per week), or do other physical activities with her family, or work as much as before. Her injuries also impacted her relationship with her life partner, leading to the eventual separation.

## II.     CONCLUSIONS OF LAW

### Liability

Golia-Huffman's remaining causes of action assert Negligence, Negligence - Premises Liability, and Respondent Superior/Vicarious Liability. A federal court exercising diversity jurisdiction applies the substantive law of the forum state. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To state a claim of negligence under Nevada law, the plaintiff must demonstrate "(1) that the defendant had a duty to exercise due care with respect to the plaintiff; (2) that the defendant breached this duty; (3) that the breach was both the actual and proximate cause of the plaintiff's injury; and (4) that the plaintiff was damaged." *Joynt v. California Hotel & Casino*, 835 P.2d 799, 801 (Nev. 1992). A Nevada "business owes its patrons a duty to keep the premises in a reasonably safe condition for use." *Sprague v. Lucky Stores, Inc.*, 849 P.2d 320, 322 (Nev. 1993).

If a patron slips because of a foreign substance on the floor, the business will be liable if the owner or its agent either caused the substance to be on the floor or "had actual or constructive notice of the condition and failed to remedy it." *Id.* at 322-23. A business owner "has a duty to an invitee to inspect the premises to discover dangerous conditions not known to him and to take reasonable precautions to protect the invitee from dangers which are foreseeable . . . ." *Twardowski v. Westward Ho Motels, Inc.*, 476 P.2d 946, 947-48 (Nev. 1970) (quotation omitted). In addition, Smith's policy required

5

inspections every half-hour, floors to be clean at all times, and spills cleaned up as soon as they are found. Exh. 73 at 3-4.

Smith's employee Greaney saw "lose pedals (sic) and drops of water" in the area where Golia-Huffman fell shortly before the fall. Exh. 67. He had a duty under Smith's policy to clean it up immediately. There is no evidence he did so. His statement gives Smith's actual notice of the hazardous condition.

However, the video does not show Greaney conducting an inspection during the time he claims he did. Thus, he may have lied in his statement and not actually inspected the area of the fall, which would violate Smith's policy and render Smith's liable. Or, he may have inspected the area but was off-camera. If so, then, again, Smith's has actual notice of a hazard and did not clean it up. Either way, Smith's is liable.

The surveillance video shows no Smith's employee inspecting or cleaning the area of the fall for at least an hour before the fall. Rose petals are seen in the front of the floral department (away from where Golia-Huffman fell) and no one cleaned that up for at least an hour. To the contrary, a Smith's employee is seen wiping petals off a table and onto the floor, adding to the hazard, without cleaning it up during the video. While this was not in the immediate area of the fall, when combined with the fact that no Smith's employee inspected or cleaned the area of the fall for at least an hour before the fall, it strongly suggests that Smith's failed in its own policy and Nevada law to inspect the premises to discover and address hazardous conditions. *Twardowski*, 476 P.2d at 947-48.

Smith's proposes at least two alternative causes of the fall. First, it contends that water could have dripped from the bouquet in Golia-Huffman's left hand and fallen directly into her path. But based on the video, it seems implausible that, while she was

6

turning and taking a step or two, enough water would have dripped from the bouquet directly in front of her in time for her to step in it and fall from it.  Second, Smith's contends the flip-flops Golia-Huffman was wearing could have become wet while she stood on the mat in front of the flowers, such that her wet footwear slipped when she stepped onto the hard floor.  If so, then Smith's should have been aware of the wet condition of the mat, given that Mother's Day is one of the busiest days for the floral department and water normally drips from the bouquet bins (hence the need for the mats).  And the unrebutted testimony of Golia-Huffman's expert Perez is that the hard floor was more slippery than industry standard.  Even under this proposed explanation, the fault still lies with Smith's.

Golia-Huffman has proven by a preponderance of the evidence that Smith's is liable for her fall in the store.

**Damages**

There is no doubt that Golia-Huffman's fall actually and proximately caused injuries to her knee and spine.  Years before, Golia-Huffman had broken bones and suffered minor back injuries, but she had fully recovered from those by the time of her fall.  Before the fall, she was very physically active, playing softball several times each week and playing with her son and family.  That changed after the fall.

The testimony of Golia-Huffman's treating physicians and experts confirm that her knee surgery and all of her back treatments (including physical therapy, injections, and fusion surgery) were actually and proximately caused by the fall and were medically necessary.  She is entitled to an award of $721,727.18 for those procedures.

/ / / /

It is highly likely Golia-Huffman will need another spine surgery in the future to address adjacent level breakdown. This future procedure is actually and proximately caused by the fall and is medically necessary. The alternatives include implantation of a spinal stimulator or a fusion of adjacent levels. Because the spinal stimulator would give Golia-Huffman nearly identical relief as the fusion, is less invasive and risky than fusion, and would cost less, that is the appropriate measure of damages for a future medical procedure. Golia-Huffman is entitled to an award of $400,000 for a future medical procedure.

Golia-Huffman suffered pain, emotional damages, and loss of enjoyment of life as an actual and proximate result of the fall. She is entitled to awards for past pain and suffering in the amount of $200,000 and future pain and suffering in the amount of $50,000.

### III.  CONCLUSION

I HEREBY ORDER the clerk of the court to enter judgment in favor of plaintiff Sierra Golia-Huffman against defendant Smith's Food & Drug Centers, Inc. on her claims of Negligence, Negligence - Premises Liability, and Respondent Superior/Vicarious Liability in the total amount of $1,371,727.18.

I FURTHER ORDER the clerk of the court to close this case.

DATED this 13th day of May, 2025.

ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE